### UNITED STATES DISTRICT COURT
### NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| WELLS FARGO CLEARING SERVICES, LLC D/B/A WELLS FARGO ADVISORS, LLC, | ) ) ) | Case No. 1:25-cv-00775 |
| | ) | Judge: Matthew F. Kennelly |
| Plaintiff, | ) ) | Magistrate Judge: M. David Weisman |
| v. | ) ) | |
| ELIAS FRIEDMAN AND CYNTHIA JONES, | ) ) ) | |
| Defendants. | ) ) ) | |

### MEMORANDUM IN SUPPORT OF WELLS FARGO CLEARING SERVICES, LLC D/B/A WELLS FARGO ADVISOR, LLC'S MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

Plaintiff, Wells Fargo Clearing Services, LLC d/b/a Wells Fargo Advisors, LLC ("WFA"), by and through its attorneys, Miles D. Hart, John D. Dalton, and Christopher D. Mackey of Saretsky Hart Michaels + Gould PC, and in support of its Motion for Temporary Restraining Order and a Preliminary Injunction against Defendants Elias Friedman ("Friedman") and Cynthia Jones ("Jones"), submits this Memorandum.[1]

### INTRODUCTION

WFA seeks a temporary restraining order and preliminary injunction against Defendants - former employees of the firm - because they: breached the terms of their agreements with WFA,

---

[1] Simultaneous with the commencement of this action, Plaintiff is filing an arbitration proceeding against Defendants before FINRA seeking permanent injunctive relief. Pending final determination in arbitration, Plaintiff is entitled to seek temporary/preliminary injunctive relief from this Court, even though the merits of the dispute between the parties ultimately will be resolved in arbitration. Rule 13804 of the FINRA Code of Arbitration Procedure for Industry Disputes requires a party seeking interim injunctive relief to obtain such relief from a court of competent jurisdiction.

and Friedman has converted and is misusing confidential and proprietary WFA customer information for the benefit of Friedman and his new employer, Mariner Independent ("Mariner").

Pursuant to their agreements with WFA, and Friedman's membership in or registration with the Financial Industry Regulatory Authority ("FINRA"), the parties are required to litigate the underlying merits of this dispute in arbitration. WFA is, however, expressly permitted by way of the parties' agreements and FINRA Code of Arbitration Procedure §13804 to seek emergency injunctive relief from a court of law pending arbitration.

**FACTUAL BACKGROUND**

I.     **WFA Supports Defendants' Business**

WFA provides personalized investment guidance and advice to customers throughout the United States. WFA takes substantial precautions to maintain and protect the secrecy of its clients' private information.  For example, WFA maintains a proprietary computer network that is secured by password and user ID protections to prevent unauthorized access.  Moreover, WFA limits access to client information to those employees who have a need to know it.  WFA requires those employees to agree to maintain the confidentiality of proprietary client information.

Friedman affiliated with WFA in January 2001. While employed by WFA in its Schaumburg, Illinois branch office, he serviced WFA clients with more than $1 billion in assets under management, which had generated millions in annual commissions and fees. Jones is a former employee of WFA who retired from WFA on May 31, 2021 after working with the firm (or a firm previously acquired by WFA) for decades.

WFA provided significant professional and monetary support to Defendants during their employment, including extensive support services; paid for facilities, computer equipment, market reporting services, and other business expenses; provided Defendants with abundant sales

opportunities; registered Defendant with the New York Stock Exchange, Financial Industry Regulatory Authority, and other licensing bodies; and provided Defendants with WFA benefits, systems, and support at all times. Additionally, WFA provided Defendants with office facilities, secretarial services, clearing services, operational systems, sales assistants, research, the benefit of WFA advertising, goodwill and name recognition, access and use of experts in asset management, tax, estate planning and insurance, and with promotional, marketing and sales support.

By virtue of Defendants' employment at WFA, they gained access to the books and records of WFA, the confidential information contained therein, and especially the identity of WFA customers, including their names and addresses, telephone numbers, e-mail addresses, account numbers, social security numbers, driver's license numbers, financial statements, investment objectives, assets, net worth, investment histories, and the securities held by these customers in their WFA accounts.

## II. Defendants Execute WFA Agreements

On or about May 18, 2018, Defendants entered into a WFA Financial Advisor Succession Agreement (the "Succession Agreement"). Exhibit "1". The Succession Agreement was intended to provide Friedman and Mike McCarthy (a current WFA financial advisor) and a retiring WFA financial advisor (Jones) with a framework within which to coordinate the smooth transition of client accounts after Jones's retirement. The Succession Agreement provided terms and conditions for the period of time leading up to the retirement date and then a post-retirement period in which Friedman and McCarthy would assume the management of the underlying client accounts at WFA and pay to Jones a certain monthly sum to compensate her for essentially handing over her client accounts and the revenue generated therefrom. Exhibit "1" §8.

By signing the Succession Agreement, Friedman agreed not to solicit any clients associated

3

with the Succession Agreement for one year following his termination. *Id*. at §16. Friedman was likewise prohibited from having others solicit clients on his behalf. *Id*. The Succession Agreement further provided that Friedman was prohibited from taking confidential information related to clients associated with the Succession Agreement. *Id*. As to Jones, the Succession Agreement prohibited her from among other things, providing any clients with investment advice, soliciting clients to transfer their accounts, and soliciting trades in securities in any way. *Id*. at §15(a)(iv). Defendants both agreed that WFA was entitled to injunctive relief to enforce the covenants and they consented to the issuance of a temporary restraining order to maintain the status quo. *Id*. at §17.

On or about January 13, 2021, Friedman entered into a WFA Team Agreement (the "Team Agreement") with McCarthy. Pursuant to the Team Agreement, Friedman agreed not to solicit any clients that he did not bring or introduce to the team. See Exhibit "2", §7. He likewise agreed not to take any confidential client information with him relating to same. *Id*.

Jones retired from WFA on May 31, 2021. On November 18, 2024, Friedman was terminated from WFA.[2]

### III.  **Defendants Breached their WFA Agreements**

Friedman, after he was terminated and before he was registered with any RIA or FINRA registered broker-dealer, solicited WFA clients by telling them that he was going to be joining a

---

[2] The basis for WFA's termination is not at issue in this matter. That said, the basis for the termination would have given many clients pause as to whether they wanted to continue working with Friedman. WFA, rightfully did not disclose the basis for Friedman's termination to clients, yet Friedman reached out to numerous clients following his termination to explain his side of the story and let them know he'd be joining a new firm. No one would feel compelled to provide their side of the story, tell a client they will be joining a new firm, and then re-engage contact with that client several weeks later to simply 'announce' they joined a new firm if the intent was not to induce the transfer of assets. One does not go to all that trouble if they are merely announcing their new position, especially because no client knew WFA had terminated Friedman (the filing of a FINRA Form U5 upon termination is non-public) let alone the basis for said termination.

new firm shortly and that he would let them know when he was registered. Friedman called, texted, and emailed these WFA clients, some of whom reached out to WFA personnel because they were upset with the contact made by Friedman Indeed, one WFA client received an email message from Friedman stating

> I am also emailing to notify you that I no longer am employed by Wells Fargo. I will be joining a new firm shortly and will provide you with my new contact information at the new firm once I am registered to do business with that firm. Meanwhile, should you have any business or account related inquiries prior to my joining my new firm, please direct those inquires [sic] to Mike McCarthy at Wells Fargo.

Another client received a holiday card from Friedman and his family – something he had never received from Friedman in the years prior to his termination from WFA. And, yet another client received a text message from Friedman claiming that the client needed to "come in" for an annual review. Such a statement is concerning given Friedman was not registered with any firm and it confused the client as who Friedman worked for, including whether he was advising the client to meet Friedman at WFA.

The only reason an advisor would contact a client following involuntary termination is to solicit their business away from WFA. Per FINRA Regulatory Notice 19-10, Friedman knew that WFA would be obligated to inform clients that he was no longer servicing their accounts.[3] Moreover, Friedman's contact with clients via phone, text, email, and mail demonstrates that he had access to that information following his termination, a direct violation of his WFA agreements.

Thereafter, upon joining Mariner on January 8, 2025, Friedman contacted those same

---

[3] Of note, Friedman and McCarthy were a team, meaning all of Friedman's accounts smoothly transitioned to McCarthy following his termination, who was already uniquely familiar with all accounts because he was already listed as the representative of record. In other words, the clients were never without a familiar broker managing their funds, which makes it unnecessary for Friedman to contact said clients let alone advise them that he would be joining a new firm shortly.

clients to let them know he had joined a new firm, and began soliciting their business. For example, on January 16, 2025, a WFA Succession Agreement client called a WFA client associate and explained to her that Friedman had FaceTimed the client from his new office at Mariner where he and Jones (also at Friedman's office and on the FaceTime call) told the client to join Friedman at Mariner. Indeed, the client stated Jones said something to the effect of "I'm moving my accounts to Mariner so you should too." So, not only did Friedman and Jones solicit this client in violation of the Succession Agreement, Friedman had already wrongfully but successfully solicited Jones, a WFA client, to move her accounts to Friedman at Mariner.

In the time since Friedman joined Mariner, over $40 million in assets under management has already transferred to Mariner. All of these accounts were associated with the Succession Agreement or were under the Team Agreement. There would be no reason for these clients to transfer their accounts to a new firm when, for over seven weeks, they were serviced by McCarthy, a known and trusted representative who had been servicing the accounts for years.

## **ARGUMENT**

### I.   **STANDARD OF REVIEW**

This Court has the authority to issue a preliminary injunction under Fed. R. Civ. P. 65(a). The Court further has the power to grant injunctive relief even where an arbitrable dispute is pending arbitration, as long as the prerequisites for injunctive relief are satisfied. *See, e.g., Local Lodge No. 1266, Int'l Ass'n of Machinists & Aerospace Workers, AFL-CIO v. Panoramic Corp.*, 668 F.2d 276, 285 (7th Cir. 1981); *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Cross*, 1998 WL

122780 (N.D. Ill. Mar. 13, 1998). [4]

A party seeking injunctive relief under Illinois law must demonstrate (1) likelihood of success on the merits; (2) lack of an adequate remedy at law; and (3) irreparable harm should an injunction not be issued. *SKF USA, Inc. v. Bjerkness*, 636 F. Supp. 2d 696, 705 (N.D. Ill. 2009). The Court must then balance on a "sliding scale" the irreparable harm to plaintiff against the harm a defendant will suffer if an injunction is issued. *Turnell v. Centimark Corp.*, 796 F.3d 656, 662 (7th Cir. 2015). Under the "sliding scale" analysis, the greater a party's likelihood of success on the merits, the less harm that party needs to show, and vice versa. *Id*. The court must also consider harm to the public interest should an injunction be issued. *Turnell*, 796 F.3d at 662; *Lynch*, 2010 WL 3156006, at *4.

Here, a temporary restraining order is necessary to prevent Defendants from flouting the unambiguous contractual terms of their respective WFA agreements, and specifically the Succession Agreement, which provides for the imposition of an injunction against Defendants to prevent violations of the non-solicitation clause. As agreed in the Succession Agreement, Defendants expressly consented to issuance of a temporary restraining order and/or preliminary injunction to protect WFA's rights and thus have acknowledged that each of the injunctive relief factors favor WFA. Exhibit "1", §17. Accordingly, Defendants should be estopped from contesting WFA's right to injunctive relief. Regardless, the factors evaluated by the Court in deciding whether to grant injunctive relief all favor WFA, and, therefore, the entry of an injunction is warranted.

---

[4] Pursuant to the terms of Defendants' Succession Agreement, Missouri law governs the enforcement of the agreement. Exhibit "1", ¶23(d). Accordingly, WFA submits that the Succession Agreement and issues present herein should be governed and construed under Missouri law. WFA incorporates Illinois law herein as added support for its position. Under Missouri law, to be entitled to a temporary restraining order, the plaintiff must demonstrate that (1) it is likely to succeed on the merits; (2) it will likely suffer irreparable harm absent an injunction; (3) the balance of hardships weighs in its favor; and (4) the injunction is in the public interest. *Chevron U.S.A. v. 11500 Manager, LLC*, No. 09-6070-CV-SJ-HFS, 2009 U.S. Dist. LEXIS 58330, 2009 WL 1974590, at *2 (W.D. Mo. July 7, 2009)

Such an order is necessary to preserve the status quo pending arbitration before FINRA.

## II. WFA HAS SATISFIED ALL REQUIREMENTS FOR INJUNCTIVE RELIEF

### A. WFA Is Likely To Succeed On The Merits Because Defendants Breached Their Agreements

WFA has a strong likelihood of success on the merits. Notably, courts in Illinois have recognized the right of financial services firms to obtain injunctive relief against former employees under similar circumstances. See e.g., *Aon PLC v. Infinite Equity, Inc.*, No. 19 C 7504, 2021 WL 4192072 (N.D. Ill. Sep. 15, 2021) (granting preliminary injunction prohibiting solicitation of former employer's clients that defendants learned from former employer); *Scheffel Financial Services, Inc. v. Heil*, 2014 IL App (5th) 130600, ¶ 22, 16 N.E.3d 385 (upholding preliminary injunction where former employee was prevented from using or disclosing any of his former employer's confidential information and from having any direct contact or personal solicitation of its clients or customers); *see also Brown & Brown, Inc. v. Ali*, 494 F. Supp. 2d 943, 956 (N.D. Ill. 2007); *IDS Fin. Services, Inc. v. Smithson*, 843 F. Supp. 415 (N.D. Ill. 1994); *Lifetec, Inc. v. Edwards*, 377 Ill. App. 3d 260, 880 N.E.2d 188 (Ill. App. Ct. 2007); *Diamond Blade Warehouse, Inc. v. Paramount Diamond Tools, Inc.*, 420 F. Supp. 2d 866, 872 (N.D. Ill. 2006).

Here, Friedman acknowledged and agreed that he would not solicit clients subject to the Succession Agreement for one year following his termination, and he would not solicit clients he did not originate that were subject to the Team Agreement for one year post termination from WFA. Despite the foregoing, Friedman solicited numerous clients as described herein. Friedman further agreed not to take WFA confidential information or documents. Upon information and belief, he took WFA property and has and continues to use that information, including names and contact information of clients, to improperly solicit business away from WFA.

Jones, on the other hand, acknowledged and agreed not to contact any clients associated

with the Succession Agreement to provide investment advice after her retirement and not to solicit clients to transfer their assets or transact business.

### 1. Defendants' Agreements are Clearly Enforceable

Restrictive covenants are enforceable if they comply with "[t]he modern, prevailing common-law standard of reasonableness for employee agreements not to compete [which] applies a three-pronged test." *Reliable Fire Equip. Co. v. Arredondo*, 965 N.E.2d 393, 396 (Ill. 2011) (*citing BDO Seidman v. Hirshberg*, 93 N.Y.2d 382 (N.Y. 1999)).

> A restrictive covenant, assuming it is ancillary to a valid employment relationship, is reasonable only if the covenant: (1) is no greater than is required for the protection of a legitimate business interest of the employer-promisee; (2) does not impose undue hardship on the employee-promisor, and (3) is not injurious to the public.

*Reliable Fire*, 965 N.E.2d at 396-97.[5]

### a. The Non-Solicitation Clauses Are Enforceable

To assess the reasonableness of a non-solicitation restrictive covenant the court must determine whether a legitimate business interest exists. *Reliable Fire*, 965 N.E.2d at 397.

> Factors to be considered in this analysis include, but are not limited to, the near-permanence of customer relationships, the employee's acquisition of confidential information through their employment, and time and place restrictions. No factor carries any more weight than any other, but rather its importance will depend on the specific

---

[5] "In Missouri there are two primary considerations governing the enforceability of covenants not to compete: the parties' agreement must protect well recognized employer interests, and the terms must be reasonable in geographic and temporal scope." *Emerson Elec. Co. v. Rogers*, 418 F.3d 841,844 (8th Cir. 2005). "The question of reasonableness of a restraint requires a thorough consideration of surrounding circumstances, including the subject matter of the contract, the purpose to be served, the situation of the parties, the extent of the restraint, and the specialization of the business." *Id*. at 846 (*quoting House of Tools and Eng'g, Inc. v. Price*, 504 S.W.2d 157, 159 (Mo. Ct. App. 1973)). "The protection of customer relations from misappropriation by a person leaving the business is recognized as a legitimate business interest." *Software Pricing Partners*, 2020 U.S. Dist. LEXIS 105310, at *20-21. Likewise, an employer has a "legitimate interest in protecting client relationships that individuals build under the company's roof." *Lockton Co., LLC v. Kaufman*, No. 22-cv-00462-SRB, 2024 U.S. Dist. LEXIS 92986, at *28 (W.D. Mo. May 6, 2024).

facts and circumstances of the individual case.

*Id*. at 403. Here, all of these factors weigh in favor of enforcing the restrictive covenants.

First, "[t]he factors considered in determining whether a near-permanent relationship exists include: (1) the number of years required to develop the clientele; (2) the amount of money invested to acquire clients; (3) the degree of difficulty acquiring clients; (4) the extent of personal customer contact by the employee; (5) the extent of the employer's knowledge of its clients; (6) the duration of the customers' association with the employer; and (7) the continuity of the employer-customer relationship." *CUNA Mut. Life Ins. Co. v. Kuperman*, 1998 WL 409880, *6 (N.D. Ill. July 7, 1998). WFA's clients are "near-permanent" as the majority of the clients serviced by Defendants have been clients of WFA or its affiliates/predecessors for many years. Moreover, Defendants spent the majority of their tenure in the financial services industry servicing the customers only with the support of WFA. Further, WFA has built the loyalty of its client base through many years of effort and has invested substantial resources in terms of time, effort and money annually to build relationships with its clients. Thus, WFA's long-standing relationships with its clients supports the issuance of injunctive relief. *See Hanchett Paper Co. v. Melchiorre*, 341 Ill. App. 3d 345 (Ill. App. Ct. 2nd Dist. 2003) (affirming injunctive relief against defendant prohibiting solicitation of former employer's customers where former employer maintained a near-permanent relationship with its customer base).

The second and third prongs of the test have been met here as well, because (1) Defendants would not have had access to WFA client information but for their employment with WFA, and

(2) the temporal and geographical[6] restrictions are not unreasonable. Specifically, both agreements are limited to one year post termination, and the Team Agreement only prohibits Friedman from soliciting clients he did not introduce to the team for one year. The restriction imposed by the Succession Agreement is intended to facilitate the continued payment to the retiring financial advisor (i.e., to make sure Friedman doesn't leave WFA with the retiring advisor's entire book of business, which would then deprive the retiring advisor of receiving any reasonable retirement compensation). Illinois courts have enforced restrictive covenants with greater temporal and geographical restrictions. *See Zabaneh Franchises, LLC v. Walker*, 972 N.E.2d 344, 350 (Ill. App. Ct. 4th Dist. 2012) (ruling a two-year restriction is reasonable).

The Succession Agreement further prohibited Jones from providing investment advice to WFA clients while she was unregistered, including influencing WFA clients to transfer their accounts elsewhere. These restrictive covenants are common in the brokerage industry.[7] As a result, the client-based limitations in both agreements are reasonable and clear. Indeed, the Team Agreement does not restrict Friedman's ability to solicit clients he brought or introduced to the team.

### b.     The Confidentiality Clauses Are Enforceable

---

[6] "[W]hile a non-competition clause must have a reasonable geographic scope, the same is not true of non-solicitation clauses….This is due to the fact that a tightly drafted nonsolicitation clause will narrowly circumscribe the class of people with whom contact is prohibited, so it need not preclude the availability of future employment opportunities, and as a result, territorial limits may not be necessary in order to protect employees' interests in finding posttermination employment". *Brown & Brown, Inc. v. Muhammad Munawar Ali*, 592 F. Supp. 2d 1009, 1045 (N.D. Ill. 2009) (internal citations omitted).

[7] Given the competitive nature of the brokerage industry, WFA invests a significant amount of time, money, and resources in developing its client base and identifying needs and preferences of its clients. This information provides WFA with a competitive advantage in providing brokerage services to its clients. By virtue of Friedman's 23-year employment with WFA and Jones's 30+ years with WFA, they possessed detailed knowledge of individual clients, learning their unique needs and preferences through their employment at WFA. Moreover, Friedman specifically acquired the ability to service numerous client accounts and obtain information and knowledge unique to those clients via the Team Agreement and Succession Agreement.

"[A] confidentiality agreement will not be deemed unenforceable for lack of durational or geographic limitations where trade secrets and confidential information are involved." *Coady v. Harpo, Inc.*, 308 Ill. App. 3d 153, 161 (Ill. App. Ct. 1st Dist. 1999) (finding reasonable and enforceable a confidentiality agreement with no temporal nor geographic limitations); The provisions in Friedman's WFA agreements prohibiting the taking or using of WFA's documents and information seek to protect WFA confidential information, which is a permissible interest to be protected by an employer. *See Orthofix Inc. v. Gordon*, No. 13-cv-01463, 2016 WL 1170896, at *8 (C.D. Ill. Mar. 24, 2016) (finding two types of information are protectable by an employer including trade secrets and other confidential information). The preservation of confidential information is a legitimate business interest. *See SKF USA, Inc. v. Bjerkness*, 636 F. Supp. 2d 696, 710 (N.D. Ill. 2009). Moreover, there is no "anti-competitive effect" if Friedman is prohibited from taking confidential client information from WFA to use for his and his new employer's benefit in direct violation of his WFA agreements. He can still compete and work in his chosen profession; thus, the agreements are reasonable.

**B.     WFA Will Suffer Irreparable Harm**

Absent immediate injunctive relief, WFA will suffer irreparable harm on several levels. First, it will be impossible to measure WFA's damages with any reasonable degree of certainty. The threat of a permanent loss of customers and the potential loss of goodwill support a finding or irreparable harm. *See Turnell v. Centimark Corp.*, 796 F.3d 656, 666 (7th Cir. 2015) (describing the injuries flowing from the violation of restrictive covenants as "a canonical form of irreparable harm…difficult to prove and quantify").[8]

---

[8] Missouri courts are in agreement. *See H&R Block E. Enters. v. Sanks*, No. 16-00206-CV-W-GAF, 2017 U.S. Dist. LEXIS 213480, at *15 (W.D. Mo. June 6, 2017) *citing  Rogers Grp., Inc. v. City of Fayetteville, Ark.*, 629 F.3d 784, 789-790 (8th Cir. 2010); *Associated Producers Co. v. City of Independence*, 648 F. Supp. 1255, 1258 (W.D. Mo. 1986); *Am. Nat'l Ins. Co. v. Coe*, 657 F. Supp. 718, 723 (E.D. Mo. 1986).

12

Prior to Friedman's departure, he had access to customer accounts representing nearly $1 billion in assets under management, and which generated millions in annual commission and/or fee revenue for Friedman, his team member Mike McCarthy, and WFA. It is impossible to determine at this time the number of WFA clients who will be pirated away and the commissions or fees each of these clients will generate not only this year but 5 or 10 years into the future. Accordingly, Defendants' breach of the WFA agreements has burdened and will continue to burden WFA with financial loss, which is incapable of measurement.

Second, irreparable harm also lies in the fact that WFA's business justifiably expects its employees to honor their agreements. If Defendants are permitted to continue their conduct, other departing advisors will see no need to adhere to post-employment commitments they made with WFA. This includes loss of goodwill and reputation among its own employees who are approaching retirement and may not trust the Firm to uphold agreements that preserve well-deserved post-retirement payments for loyalty and extended service. As a result of Defendants' conduct alone, WFA's employee relationships are in jeopardy.

Moreover, Friedman's decision to remove highly confidential information and documents about clients wreaks havoc upon the customers' and WFA's rights to keeping their information private. As a result, WFA's customer relationships are in jeopardy, including a loss of trust and confidence in WFA's ability to protect customer information.

Lastly, Defendants acknowledged and agreed that any breach of their restrictive covenants would result in immediate and irreparable harm entitling WFA to the issuance of a temporary restraining order and injunction. Exhibit "1", §17. *See PrimeSource Bldg. Prods. v. Huttig Building Prods., Inc.*, 2017 WL 7795125 *12 (N.D. Ill. Dec. 9, 2017).("[A]ll of the relevant contracts include language stating that a breach of their respective covenants constitutes irreparable harm.

13

That is a factor weighing in favor of an irreparable harm finding"). Here, the irreparable harm suffered by WFA resulting from Defendants' breach warrants the issuance of the requested preliminary injunction.

### C. An Injunction Will Not Cause Harm To Others

The benefits of injunctive relief to WFA far outweigh any detriment to Defendants or others. Here, Defendants are simply being ordered to abide by the terms of their agreements. Friedman is free to be employed in the securities industry, to work at Mariner, to solicit the clients he brought or introduced under the Team Agreement, and to advise others on financial matters. He, however, cannot solicit WFA clients subject to the Team Agreement that he did not originate and those associated with the Succession Agreement through November 18, 2025. And, he cannot retain confidential client information and documents that belong to WFA. Moreover, the clients are not harmed. They are free to work with the person of their choosing. But again, Friedman cannot solicit them.

Conversely, the harm to WFA is significant and everlasting. The sanctity of contractual agreements is destroyed and the trust and confidence current customers and employees have in the Firm are reduced to nothing unless Defendants are enjoined and ordered to cease violating the terms of their agreements, including to return all improperly removed client documents and information. In the end, WFA seeks a return to the status quo through an Order. Clearly, an injunction will not harm others.

### D. The Public Interest Is Supported By Issuing An Injunction

Finally, the public interest is supported by issuing an injunction in this case. Indeed, the public has an interest in the enforcement of contracts. *IDS Life Ins. Co. v. SunAmerica, Inc.*, 958 F. Supp. 1258, 1282 (N.D. Ill. 1997), *aff'd in part, rev'd in part* 136 F.3d 537 (7th Cir. 1998);

14

*PCTV Gold, Inc. v. SpeedNet, LLC*, 508 F.3d 1137, 1145 (8th Cir. 2007); *Sleep No. Corp. v. Young*, 33 F.4th 1012, 1019 (8th Cir. 2022). Moreover, a "covenant preventing Defendants from disclosing confidential business matters does not cause any injury to the public or to Defendants ... All the Agreement purports to do is protect [employer's] confidential information, an interest which does not adversely affect competition within the industry." *SKF USA, Inc. v. Bjerkness*, 636 F. Supp. 2d 696, 714-15 (N.D. Ill. 2009).

## III.    CONCLUSION

For the reasons stated above and supported throughout, WFA respectfully requests entry of a temporary restraining order and preliminary injunction pending the outcome of arbitration held in accordance with the FINRA Rules. A proposed Order is attached hereto as Exhibit "3".

Respectfully submitted,

Saretsky Hart Michaels + Gould PC
Attorneys for Plaintiff

By: *S/ Miles D. Hart*

Miles D. Hart (6208488)
John D. Dalton (6197108)
Christopher D. Mackey (6324275)
118 N Clinton St. Suite 425
Chicago, Illinois 60661
(248) 502-3300

Dated: January 23, 2025